Filed 8/7/26  P. v. Bacon CA3

<u>NOT TO BE PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>v.<br><br>RYAN JOAQUIN BACON,<br>    Defendant and Appellant. | C101897<br><br>(Super. Ct. No. 62185967) |

Defendant Ryan Joaquin Bacon stabbed his elderly roommate to death.  He initially denied any responsibility but later confessed to police.  After considering Bacon's testimony at trial as well as his earlier, inconsistent statements to police about the circumstances surrounding the stabbing, the jury rejected his claim of self-defense and convicted him of first degree murder.  He was sentenced to prison for 25 years to life plus one year.

Bacon appeals, contending the trial court prejudicially erred in allowing the prosecutor to introduce excerpts of his police interrogation during its rebuttal case because his statements were not voluntary and freely made.  He argues the statements were involuntary and coerced given the interview's length and location, the detectives' use of a ruse, the invocation of his religion and family to get him to confess, and their knowledge that he consumed methamphetamine and was tired from lack of sleep.  Finding no merit to his contentions, we shall affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Murder of D.C. and Bacon's Police Interrogation*

In June 2022, the victim D.C. was found dead in a home in Roseville that he shared with Bacon, Thomas M., and Omar A. D.C. died from multiple sharp force injuries to the abdomen with blunt force injury to his neck tissue. The pathologist opined the neck injuries were likely caused by pressure or force being applied to both sides of D.C.'s neck. He had been stabbed 17 times and police recovered a knife blade that was missing its handle from his abdomen.

Bacon was arrested a few hours after D.C.'s body was discovered and had a knife handle matching the blade recovered from D.C.'s abdomen. Following his arrest, Roseville Police Detectives Chris Guild and Pat Ganguet interrogated Bacon at the police station for about four and one-half hours.

The interrogation began around 3:40 p.m. and lasted until about 8:20 p.m. After some preliminary introductions and questions, Detective Guild advised Bacon of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. After indicating he understood these rights, Bacon proceeded to answer the detectives' questions.

The interrogation occurred in two different windowless police interview rooms, each measuring approximately six feet by six feet. The first room had a table and three chairs, while the second room had three chairs but no table. Bacon was handcuffed during the entire interview. The detectives took two breaks of about 12 and 16 minutes, respectively, and gave Bacon a bottle of water but no food. He was allowed to use the restroom during the second break. Throughout the interrogation, Bacon repeatedly complimented the detectives on how well they had treated him.

Bacon initially told the detectives that he awoke around 9:00 a.m., lifted weights, ate, and watched television before going for a walk sometime around 2:00 p.m. He saw D.C. on the couch that morning, and they greeted one another. When told D.C. was dead,

Bacon said he had "no idea" what happened to him. Over the next several hours, Bacon continued to deny any knowledge of or involvement in D.C.'s death.

Bacon said he found the knife handle in a store parking lot while out walking, and he picked it up to make a weapon to defend himself. While it "seemed kind of weird" that he had a knife handle matching the knife blade used to stab D.C., Bacon denied knowing what happened.

Several times during the interview Bacon said he was "just a little tired" and "sleep deprived," telling the detectives he had consumed methamphetamine over the past three or four days and had only slept three or four hours. He periodically yawned. Detective Ganguet told Bacon the water would "help" get the methamphetamine out of his system, and Detective Guild later commented, "You're not as high now, but you were pretty high when we first started talking to you."

At one point, Bacon brought up the topic of God, stating, "God is good man." Bacon said he was religious but did not go to church. Detective Ganguet and Bacon then discussed their respective religious upbringings, and Bacon agreed that, given his faith, he would hold himself accountable if he did something wrong. Although Bacon believed "God forgives" those who confess wrongdoing and that God would forgive him for the mistakes he made that day, he "didn't do anything."

Shortly before taking the second break, Bacon was asked to describe D.C. as a person, and he responded that D.C. was "a sick individual" from whom the people of Sacramento needed to be protected. Bacon explained that D.C. had done "bad things," had worked with racist groups, and was prejudiced against Black people even though D.C. himself was Black. Bacon's intuition told him D.C. was going to hurt people and the world was a better place without him. Despite his poor opinion of D.C., Bacon still denied stabbing him. When Bacon mentioned he wanted to see his daughter, Detective Ganguet asked whether his family was safer now without D.C. Bacon responded, "yeah," but continued to deny any involvement in D.C.'s death.

3

Following the second break, the detectives used a ruse and told Bacon that D.C.'s blood was found on the knife handle, which was not true. Bacon said this information should be "disregard[ed]." When asked whether he killed D.C. in "cold blood" or if D.C. "came at [him]," Bacon said, "he came at me," but provided no further details. After this exchange, Bacon continued to assert he merely found the knife handle and did not know what happened.

Disbelieving Bacon, the detectives pressed for more information, saying they knew he killed D.C. and asking him why. Around 7:00 p.m., Bacon said D.C. was dead "because I'm Hulk," but then reiterated he found the knife handle and did not know what happened. Bacon said he did know that "God is good, man, all the time, man. And I, you know, I try to always do the right thing. Yeah." Detective Guild replied, "God wants you to atone for your sins, and you had a big one today. But if you own it and ask for forgiveness. You own it with us, and you ask for forgiveness from God, you're gonna be right with God. So it's time to do the right thing and tell us what happened." Bacon, however, said he did not understand why the detectives were asking him because he "just found that knife" and did not know what happened.

Asked again whether there was any reason he killed D.C., Bacon replied because "I am, uh, Bond, one of the guns," but then denied knowing what happened. Later, Bacon joked he was "double oh-eights," and Detective Guild told him to "stop making the classified jokes. It's not going to play anymore. All right?" Bacon apologized. At various other times during the interview he referred to himself as the "Hulk" and "double oh-seven."

Detective Guild told Bacon he could understand killing D.C. if D.C. came at him and was trying to hurt Bacon so that Bacon had to defend himself. Bacon did not claim self-defense but continued to say he did not know anything and that D.C. was alive when he left the house.

4

Bacon apologized for not making sense because he was tired. Detective Ganguet, however, assured Bacon that he was making sense, but he was not telling the truth about killing D.C. or taking responsibility for his actions. Detective Ganguet said he knew Bacon was lying to them because Bacon "immediately start[s] smiling because you know it's a lie as it rolls off your tongue."

After approximately four hours, Bacon finally admitted he stabbed D.C. because he was "not a good person" and because he was a "bad guy." He said D.C. tried to attack him with D.C.'s knife but did not further elaborate. When asked why D.C. was "that bad of a guy" that Bacon had to kill him, Bacon said it was "classified." Bacon was at peace knowing D.C. was gone.

As the interrogation continued, Bacon appeared to close his eyes, and Detective Ganguet asked him to look up so that he knew Bacon was "fully alert and awake and alive." Bacon said he was "[g]ood." Bacon then said D.C. was surprised when he stabbed him and did not "put up a fight" or try to stop him. He stabbed D.C. about five times with a knife that was soaking in a pan in the kitchen, and did not have any second thoughts about trying to save D.C. because "he's a bad dude." D.C. was "lifeless" when Bacon left the house.

Based on Bacon's statements to police and other evidence collected during the investigation, Bacon was charged with the first degree murder of D.C. (Pen. Code, § 187, subd. (a).)[1] It was alleged he personally used a deadly and dangerous weapon, a knife, during the offense. (§ 12022, subd. (b)(1).)

---

[1] Undesignated statutory references are to the Penal Code.

## II

*Motion to Suppress Bacon's Statements to Police*

Bacon moved to suppress his statements to police arguing they were not voluntary and resulted from coercive police tactics. The trial court reviewed portions of the videotaped interrogation and held a section 402 hearing where Detective Guild and Detective Ganguet testified.

At the section 402 hearing, Detective Guild confirmed he read Bacon his *Miranda* rights, did not threaten Bacon regarding his statement, and did not employ any physical intimidation or use of force during the interrogation. Although Bacon was tired and acted like "someone coming down from methamphetamine" with "low energy," he did not exhibit typical signs and symptoms of impairment such as rapid speech or nonsensical statements. Instead, Bacon was "engaged in conversation" during most of the interview and responded to their questions. Nothing about Bacon's level of impairment made him believe they should stop the interview or that Bacon could not provide useful, truthful information.

Detective Ganguet testified that he believed Bacon understood the *Miranda* advisements and that his statements were voluntary. The detectives tried to build rapport with Bacon by allowing him to talk at length about whatever he wanted, and Detective Ganguet testified that, in his experience, the four-and-one-half-hour interview was "well inside the norm" for police interviews. The detectives never threatened Bacon or removed their service weapons from their holsters. According to Detective Ganguet, Bacon did not exhibit typical signs of methamphetamine impairment, such as fidgeting, itchy skin, or rapid, incomprehensible speech, and his demeanor did not suggest that the interview should be stopped or that Bacon was incapable of providing truthful statements about what had occurred at the house earlier that day. Detective Ganguet denied that references to shining a light on the facts and not passing judgment on Bacon referred to Bacon's religion.

6

Citing relevant case law and considering the totality of the circumstances, the trial court found that Bacon's statements to police were voluntary and not coerced. In the court's view, Bacon was experienced with the criminal justice system given his prior conviction, he was properly *Mirandized*, he did not invoke his rights to an attorney or to remain silent, and the detectives were not required to re-*Mirandize* Bacon after each break. Nor were they required to take Bacon's denials at face value. The tone of the questioning was not particularly harsh or accusatory, and Bacon himself repeatedly commented that the detectives treated him fairly.

Despite Bacon's sometimes bizarre statements, the trial court found his abilities to reason or comprehend were not so disabled as to render him incapable of making a free choice during the interrogation. Bacon in fact repeated substantive questions, reflected and considered how he wanted to respond, and then responded in a lucid manner. The court did not find the religious references problematic under the circumstances, and Bacon did not appear sufficiently impaired to warrant stopping the interview.

III

*The Trial Testimony and the Jury's Verdicts*

In June 2022, Bacon lived with Thomas, Omar, and D.C. D.C. was an elderly man with some health issues. Bacon was a 34-year-old man with a "pretty athletic build." They each had their own bedroom, but D.C. usually slept on the couch in the living room. Sometime between April and June 2022, Thomas heard Bacon threaten to kill "other persons in the house." The other roommates were present when Bacon made the statement in the living room.

Early on the morning of June 15, Omar hung out with friends at the house. Around 7:45 a.m., D.C. went with those friends to a nearby store to purchase some wine. They returned a short time later and Omar's friends left the house while Omar went to his bedroom to sleep. Bacon stood near his bedroom door and asked Omar several times

7

whether he had anything to tell him. Omar repeatedly told Bacon no and asked him to step away from his bedroom door.

Bacon then went into the living room and sat on a recliner next to the couch where D.C. was sitting. Omar saw them watching television and talking, and he did not observe anything out of the ordinary. Bacon was drinking a "tall can" of beer that morning.

Thomas awoke around 8:30 a.m. and left the house to pick up breakfast. When he returned, Bacon confronted him, asking whether Thomas had anything to say to him. Thomas said no. Bacon followed Thomas to his bedroom, again asking him whether he had anything to tell Bacon. Thomas said he did not understand what Bacon's problem was and went into his bedroom and closed the door.

Thomas left for work around 9:00 a.m. Around 10:28 a.m., D.C. texted a friend he was supposed to meet later that day. Area surveillance videos captured Bacon walking from the direction of the house around 11:00 a.m. D.C. did not show up as planned and his friend was unable to reach him despite several attempts.

Thomas returned to the house around noon. He discovered D.C. lying on the living room floor with something sticking out of his stomach; D.C.'s body was cold. Thomas called 911 and woke up Omar. Resuscitation efforts were unsuccessful, and D.C. was declared dead at the scene.

An officer driving to the crime scene spotted Bacon walking on a nearby street. Bacon made eye contact with the officer and quickly turned and walked away. As Bacon tried to run across the street, he stopped in the center median and was arrested. During a search of his person, officers found the handle of a knife that matched the knife blade in D.C.'s abdomen. Bacon tested positive for methamphetamine.

Bacon testified on his own behalf, admitting that in 2019 he was convicted of obstructing or resisting an executive officer by means of threats, force, or violence. (§ 69, subd. (a).) Bacon had nightmares of being victimized and was weary of people

8

approaching him from behind because he had previously been shot in the arm, stabbed in the shoulder, and robbed during three separate incidents.

Bacon consumed methamphetamine the night before D.C. was killed, sipped on a tall can of beer, and was up all night. Around 8:00 or 9:00 a.m. on June 15, Bacon went into the living room and watched television with D.C. for about one hour while D.C. drank wine. Bacon commented on the news program, and D.C. aggressively told him, "Shut the fuck up. You're wrong." They argued for about 15 minutes, and Bacon told him they were each entitled to their own opinions.

D.C. went into the kitchen and came back holding a knife that he "aggressive[ly] … jabb[ed]" in the air. Bacon was unarmed and scared; he backed away because he did not want to get stabbed in the back again. Bacon believed D.C. would use the knife to injure or kill him, and Bacon said he had no time to leave or call for help. D.C. tried to punch Bacon while holding the knife, with the swing coming within three or four inches of Bacon's face. D.C. threw a second punch with the knife but missed, and Bacon "bear-hugged" him to stop him. Bacon "drove him back to where he came from" and then tossed D.C. over his left shoulder. He pinned D.C. on the ground next to the couch while D.C. screamed he was going to kill Bacon. The knife landed on the ground about one and a half feet away. Bacon told D.C. he would let him up if he calmed down. As Bacon started to let D.C. up, D.C. reached for the knife, and they struggled over it. D.C. scratched Bacon, and Bacon grabbed the knife and stabbed D.C. three times in his left torso. Bacon panicked and left the house; D.C. was still alive and breathing when he left. Bacon walked around for about two hours. He did not call 911 or ask the neighbors for help because D.C. attacked him and Bacon did not want to "snitch on [D.C.]"

During cross-examination, Bacon admitted that he had not told this story to police when he was arrested. The prosecution impeached Bacon with his statements to police that he got the knife from a pan of water in the kitchen, that D.C. was surprised when

9

Bacon stabbed him and did not put up a fight, that he stabbed D.C. because he was "a bad dude" and "not a good person," and that D.C. was lifeless when he left the house.

Bacon explained the discrepancy between his statements to police and his trial testimony by claiming that he was "highly impaired," "discombobulated," and could not form a sentence during the police interview. He claimed the detectives intimidated him by questioning him aggressively and displaying their weapons so he could see them.

Dr. Marine Jakubowski, a clinical forensic psychologist, also testified on Bacon's behalf. She evaluated Bacon for two hours in March 2024 and diagnosed him with posttraumatic stress disorder (PTSD) and amphetamine use disorder in remission. She found that his PTSD symptoms, such as flashbacks and hypervigilance, began when he was 23 years old and likely had continued since then because he had not been treated for it. She agreed symptoms of methamphetamine use could include irritability, aggressiveness, anger, trouble with self-control or impulse control, and paranoia.

The prosecution called Detective Guild in rebuttal. The trial court overruled defense counsel's voluntariness objection and admitted video excerpts from the first and last 20 minutes of Bacon's police interrogation, which were played for the jury.

Detective Guild testified that he gave Bacon *Miranda* warnings, did not use threats or violence while interrogating Bacon, and believed the length of the interview—four and one-half hours with two breaks—was normal for a homicide investigation. The detectives attempted to build rapport with Bacon by discussing topics unrelated to the crime, gave him water, and permitted him to use the restroom when requested. Detective Guild agreed Bacon became more tired over the course of the interview but said Bacon's tiredness and his prior methamphetamine use did not prevent Bacon from meaningfully participating in the interview, responding to questions, or communicating effectively. Detective Guild introduced the topic of self-defense during the interview by asking Bacon whether D.C. "came at him," but Bacon did not state he was defending himself when he stabbed D.C.

10

In closing argument, the prosecutor urged the jury to find Bacon guilty of murder based on his trial testimony and his inconsistent statements to police. The prosecutor argued Bacon's self-defense claim contradicted his previous police statement that he killed D.C. because he was a bad person. Self-defense was also inconsistent with the evidence, including the violent nature of D.C.'s injuries (a cluster of "17 stab wounds to the abdomen in the kill zone" plus blunt force trauma to his neck), Bacon's flight from the scene and police, his failure to seek help for D.C. or report he had been attacked, his confrontations with his roommates immediately prior to the stabbing, and the difference in age, size, strength, and health between D.C., who was elderly and in poor health, and Bacon, who was healthy, athletic, and decades younger.

Defense counsel argued that Bacon suffered from PTSD and killed in lawful self-defense after D.C. provoked and attacked him, or, alternatively, that Bacon honestly but unreasonably believed he needed to defend himself from D.C. Counsel discounted Bacon's police confession as the product of an overly long interrogation during which he was exhausted.

The jury found Bacon guilty of first degree murder and found the weapon enhancement true. The trial court sentenced him to prison for 25 years to life plus one year for the weapon enhancement. Bacon timely appealed in August 2024. His opening brief was filed in August 2025, and this case was fully briefed on April 1, 2026.

## DISCUSSION

Bacon argues the trial court erred by denying his motion to suppress his police confession because his statements to police were involuntary in light of the totality of the circumstances. He argues admitting those statements during trial violated his constitutional rights to due process and the privilege against self-incrimination, and that the error was prejudicial because it undermined his self-defense and imperfect self-defense claims. We find no error.

11

# I

"Involuntary statements to police are inadmissible for all purposes." (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 20.) "To use a defendant's statements to police at trial, the prosecutor must prove by a preponderance of the evidence that they were voluntary." (*Ibid.*)

The test for determining whether a custodial statement is voluntary is whether the statement is " ' "the product of an essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired by coercion." ' " (*People v. Cunningham* (2015) 61 Cal.4th 609, 642 (*Cunningham*); *People v. Miranda-Guerrero*, *supra*, 14 Cal.5th at p. 20 [a statement is involuntary if it was "not the product of ' " 'a rational intellect and free will' " ' "].) Courts consider the totality of the circumstances, and no single factor is dispositive. (*Cunningham*, at p. 642.) Relevant considerations include: the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's age, experience, and education; and the defendant's physical condition and mental health. (*Id.* at pp. 642-643.) While "[c]oercive police activity is a necessary predicate," it "does not itself compel a finding that a resulting confession is involuntary." (*People v. Hensley* (2014) 59 Cal.4th 788, 812.)

On appeal, we review the voluntariness of the statements independently in light of the entire record, including " 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " (*People v. Benson* (1990) 52 Cal.3d 754, 779; see also *People v. Neal* (2003) 31 Cal.4th 63, 80.) " [W]e accept the trial court's factual findings, based on its resolution of factual disputes, its choices among conflicting inferences, and its evaluations of witness credibility' " if supported by substantial evidence. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 55.)

II

According to Bacon, the interview's length and setting, the detectives' use of deception about finding D.C.'s blood on the knife handle, references to his religion and family, his level of intoxication from using methamphetamine, and his lack of sleep show his will was overborne and his incriminating statements were not freely given. We are not persuaded.

Neither the length of the interview nor the physical circumstances of the interrogation were coercive. Bacon was advised of his *Miranda* rights at the beginning of the interview, which took place in a standard police station interview room. The interview started in the early afternoon after 3:30 p.m. and concluded about 8:30 p.m. with two breaks in between. The total interview lasted about four and one-half hours, which in Detective Ganguet's experience, was "well inside the norm" for a homicide investigation. (See, e.g., *Cunningham*, *supra*, 61 Cal.4th at p. 644 [initial interview spread over a four-hour period with detectives offering both food and drink not coercive]; *Berghuis v. Thompkins* (2010) 560 U.S. 370, 386-387 [three-hour interview that was conducted in the middle of the afternoon in a standard-sized room without threats is not inherently coercive].) The detectives did not threaten Bacon, employ physical intimidation, use force, or remove their service weapons from their holsters.

Around one hour of the interview involved the detectives trying to build rapport with Bacon by allowing him to talk about a wide array of topics, including whether Bacon had considered becoming a motivational speaker. The two breaks lasted 12 minutes and 16 minutes, respectively, and Bacon was given water and allowed to use the restroom.

A review of the videotaped interview shows the tone of the questioning was not "particularly harsh or accusatory." (*Cunningham*, *supra*, 61 Cal.4th at p. 644.) Instead, the interview was calm and casual with Bacon commenting several times that the detectives were respectful and were the "nicest, coolest, laidback dudes" and were "chill

13

and patient" with him. And, as the trial court correctly recognized, the detectives were not required to take Bacon's denials at face value, especially given the physical evidence including that Bacon was arrested carrying the knife handle that matched the knife blade found in D.C.

The detectives' use of the ruse telling Bacon that D.C.'s blood was found on the knife handle was not unduly coercive. "The business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means." (*People v. Jones* (1998) 17 Cal.4th 279, 297.) A detective may imply at various times that he knows more than he does or could prove more than he could. (*Id.* at p. 299.) Here, such deception regarding the blood on the knife handle "was permissible, for it was not ' "of a type reasonably likely to procure an untrue statement." ' " (*Ibid.*) Bacon himself told the detectives to disregard the ruse evidence and continued to deny responsibility in the face of the detectives' assertion. The deception practiced by the detectives here was not of a sort likely to produce an unreliable confession, especially from someone experienced with the criminal justice system, having been convicted of obstructing an executive officer by force. (See, e.g., *People v. Williams* (2010) 49 Cal.4th 405, 442-443 [use of deceptive comments that eyewitnesses had seen the defendant near where the victim withdrew money and fingerprint evidence tied him to the crime was not of a sort likely to produce unreliable self-incrimination].)

We also conclude that referring to Bacon's religious beliefs or his family during the interview did not overcome his free will or constitute a motivating cause of his subsequent confession. On these points, we find *People v. Kelly* (1990) 51 Cal.3d 931 instructive. There, the defendant was accused of shooting and killing an 11-year-old boy after trying to drag the boy's 13-year-old cousin into his van. (*Id.* at pp. 940-942.) During a subsequent interrogation, a detective asked the defendant whether he believed in Jesus, had a Christian upbringing, believed he would someday go to Heaven, and whether he realized if his actions of allegedly murdering the boy violated his Christian upbringing

14

and the law.  (*Id.* at pp. 951-952.)  The detective also asked how the defendant's wife, mother, and the victims' families would feel knowing he had been arrested for murder, and said it was likely a foregone conclusion that he would be imprisoned for many years and that his wife was unlikely to stick around and wait for him.  (*Id.* at p. 952.)  The defendant agreed his wife, mother, and the victims' family would be upset but said he was not upset at all because he had not done anything wrong.  (*Ibid.*)

*Kelly* acknowledged that "the tactic of exploiting a suspect's religious anxieties" or exploiting a parent's fear that the failure to cooperate with police would result in not seeing his young child for many years, has been "justly condemned."  (*People v. Kelly*, *supra*, 51 Cal.3d at p. 953; but see *Berghuis v. Thompkins*, *supra*, 560 U.S. at p. 386-387 [the Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion; asking whether the defendant prayed to God for forgiveness for shooting the victim did not show statement involuntary or coerced].)  But the court found that none of the police comments there appeared to be calculated to exploit a particular psychological vulnerability of the defendant, there was no acute religious anxiety or sense of guilt apparent from earlier questioning, and the defendant was not particularly moved by appeals regarding his family or the family of the victims.  (*Kelly*, at p. 953.)  "Thus, regardless of the propriety of the officers' statements, they simply do not appear to have been a motivating cause behind defendant's subsequent confession."  (*Ibid.*)

Similar reasoning applies here.  Bacon initially stated God was "good" and the detectives' follow-up references to religion appeared to be an attempt to build rapport with him.  Bacon did not express any acute religious anxiety or sense of guilt during the interview.  He simply said he used to go to church but did not anymore, and that he believed God would forgive him for any mistakes he made that day, but that he "didn't do anything."  Thereafter, Bacon continued to deny any involvement in the crime and stuck with his story that he found the knife handle in the parking lot.  Even when

15

Detective Guild said God wanted Bacon to atone for his sins and that if Bacon asked for forgiveness he would be right with God, Bacon continued to deny knowing what happened. Thus, like in *Kelly*, regardless of whether the references to religion were proper, the statements were not a motivating cause behind Bacon's subsequent confession.

Furthermore, the detectives never told Bacon he would not be able to see his daughter or any other family member if he did not cooperate, and the comments regarding his family did not lead to any statements involving the murder. In fact, although Bacon agreed that his daughter and family were safer without D.C. because D.C. was a "sick individual," he adamantly disagreed with the detectives' suggestion that he had acted as their protector by killing D.C. that morning. He steadfastly maintained his story that he "never … did anything" and "never stabbed him."

Finally, Bacon's methamphetamine use and lack of sleep did not render his statements involuntary. To the contrary, a review of the videotaped interview and transcript demonstrates that Bacon understood the questions asked and responded appropriately. As the trial court aptly recognized, Bacon often repeated the questions and thoughtfully considered how he wanted to respond and then did so in a lucid manner. According to Detective Guild and Detective Ganguet, while Bacon said he had consumed methamphetamine, he did not exhibit typical signs and symptoms of methamphetamine use such as rapid speech, fidgeting, or making incomprehensible statements during the interview. Bacon also had the presence of mind to make up the story about finding the knife handle in a parking lot.

Although Bacon demonstrated some fatigue during the interview, Bacon said he was "good," and his replies were for the most part coherent and responsive even though evasive. To the extent Bacon made some bizarre statements referencing the Hulk, James Bond, or classified information, these statements, as Detective Guild noted, seemed calculated to joke with the detectives or evade truthfully responding to their questions.

16

Considering the totality of the circumstances and our independent review of the video of Bacon's interrogation, we cannot conclude that his confession was involuntary. (*People v. Hensley*, *supra*, 59 Cal.4th at p. 812; *Cunningham*, *supra*, 61 Cal.4th at pp. 642-643.)  Accordingly, the trial court did not err by denying his motion to suppress or admitting excerpts of his interrogation at trial.  Given our conclusion, we need not reach the People's argument that any error in admitting his statements to police was harmless.

DISPOSITION

The judgment is affirmed.

/s/
BOULWARE EURIE, J.

We concur:

/s/
HULL, Acting P. J.

/s/
ROBIE, J.

17